UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

CRYSTAL FIFER,

No. 14-14584

          Plaintiff,

District Judge Gerald E. Rosen

v.

Magistrate Judge R. Steven Whalen

COMMISSIONER OF
SOCIAL SECURITY,

          Defendant.

_____ /

## REPORT AND RECOMMENDATION

Plaintiff Crystal Fifer ("Plaintiff") brings this action under 42 U.S.C. §405(g), challenging a final decision of Defendant Commissioner ("Defendant") denying her application for Disability Insurance Benefits ("DIB") and Supplemental Security Income ("SSI") under the Social Security Act. The parties have filed cross motions for summary judgment which have been referred for a Report and Recommendation pursuant to 28 U.S.C. §636(b)(1)(B). For the reasons set forth below, I recommend that Defendant's Motion for Summary Judgment be GRANTED [Docket #22] and Plaintiff's Motion for Summary Judgment DENIED [Docket #16].

## I.   PROCEDURAL HISTORY

Plaintiff applied for DIB and SSI on November 14, 2011, alleging disability as of July 27, 2011 (Tr. 211-217, 218-223).  After the initial denial of the claim, Plaintiff requested an administrative hearing, held on April 10, 2013 in Mount Pleasant, Michigan before Administrative Law Judge ("ALJ") JoErin O'Leary  (Tr. 60).  Plaintiff, represented by attorney John Wildeboer, testified, (Tr. 65-87), as did vocational expert ("VE") Sue Lyon (Tr. 87-93).  On June 28, 2013, ALJ O'Leary found Plaintiff not disabled (Tr. 23-54).  On October 14, 2014, the Appeals Council denied review (Tr. 1-7).  Plaintiff filed suit in this Court on December 4, 2014.

## II.  BACKGROUND FACTS

Plaintiff, born March 28, 1972, was 41 at the time of administrative decision (Tr.  54, 211).  She completed high school and received training as a medical assistant (Tr. 293).  She worked previously as a clerical assistant, medical assistant, and phlebotamist (Tr. 293).  She alleges disability due to a back injury, arthritis, fibromyalgia, bipolar disorder, panic attacks, and physical and sexual abuse (Tr. 292).

### A.  Plaintiff's Testimony

Plaintiff offered the following testimony:

She currently received psychological treatment for agitation and anxiety (Tr. 65-66). She took Remeron, Lamictal, and Wellbutrin for psychological symptoms (Tr. 66).  Lamictal caused the side effect of itchiness (Tr. 66).  Her current medications had not resolved her

psychological symptoms (Tr. 66).

Plaintiff became "overwhelmed" by dealing with the physical and mental demands of everyday activities (Tr. 67). Grocery shopping and other activities caused agitation due to her dislike of being around other people (Tr. 67). Due to back and overall body pain, she required the assistance of her oldest daughter or her daughter's grandmother when grocery shopping (Tr. 67). She experienced back pain after doing "a load of dishes" (Tr. 69). Anxiety and back and other body pain caused sleep disturbances (Tr. 69-70). On her "bad days," she experienced significant physical pain accompanied by "emotional issues" (Tr. 71). Approximate 10 to 12 days each month, she did not "feel like doing anything at all," noting that at those times, she did not leave the house (Tr. 72).

Plaintiff was unable to sit for more than 15 minutes at a time or stand for more than 10 without requiring a position change (Tr. 73-74). She coped with pain by putting her feet up for 20 to 30 minutes (Tr. 73). She reclined 10 times a day (Tr. 74). She stopped working as a medical assistant after experiencing back pain lifting charts and because she became agitated dealing with the normal stressors of the office and getting along with coworkers (Tr. 74-75). Her anxiety and agitation affected her ability to concentrate on her work (Tr. 76). Prior to the office job, she was fired from another job (Covenant) for tardiness and "rolling [her] eyes" at supervisor(s) (Tr. 77). She also experienced difficulty getting along with coworkers (Tr. 77).

Plaintiff had not used alcohol in the past three months, but her psychological

-3-

difficulties had not improved since abstaining (Tr. 78).  She previously abused alcohol to cope with the trauma of spousal abuse (Tr. 78).  She lost her job, car, and house due to alcoholism and sought treatment after threatened with the possibility that her children would be taken away from her (Tr. 79).  She currently attended AA meetings (Tr. 80).  She experienced constant body aches (Tr. 82).  Bilateral hand and finger numbness caused her to drop things (Tr. 82-83).  She experienced shoulder pain while reaching overhead (Tr. 83).

In response to questioning by the ALJ, Plaintiff stated that she worked at Covenant 40 hours each week (Tr. 85).  She stated that she had been fired from most of her jobs (Tr. 86).  She testified that the middle three fingers of the right hand (dominant hand) experienced the most numbness (Tr. 86).

### B. Medical Records

#### 1. Treating Sources[1]

A September, 2008 MRI of the lumbar spine showed a "minimal" herniation at T12-L1 with a perineural cyst along the nerve root sleeve (Tr. 766-767).  An April, 2010 MRI of the lumbar spine showed a "cystic structure within the neural foraminal canal" (Tr. 770-771).  In June, 2010, Larissa Bruma, M.D. performed nerve conduction studies of the lower extremities, noting that the study was "suggestive but not diagnostic of polyneuropathy" attributable to Plaintiff's gastric bypass surgery (Tr. 493).  She found additionally that the

---

[1]

Medical records unrelated to the disability claim and records significantly predating the alleged onset of disability, while reviewed in full, are omitted from the present discussion.

study was suggestive of radiculopathy (Tr. 493). She gave samples of Cymbalta for both the nerve condition and Plaintiff's "occasional depression" (Tr. 493). A February, 2011 MRI of the lumbosacral spine showed a "mild to moderate" disc herniation at T12-L1 and a mild disc herniation at L1-L2 showing a "neurofibroma" in the neural foramina rather than a cyst (Tr. 378, 380, 767-768, 772-774). The condition was deemed unchanged since the 2008 study (Tr. 773). The same month, a CT of the facial bones was positive for sinusitis (Tr. 381). Nerve conduction studies of the upper extremities performed the following week were consistent with "right sided cervical radiculopathy" and "right motor neuropathy at the elbow" (Tr. 496). Dr. Bruma, noting Plaintiff's report that Cymbalta did not improve her condition, recommended occupational therapy and wrist splints (Tr. 497). She found that "multiple tender points" were consistent with "severe fibromyalgia" (Tr. 501). She again recommended occupational therapy as well as aqua therapy (Tr. 501).

In April, 2011, Plaintiff was referred to an employee assistance program in response to conflicts with coworkers and supervisors (Tr. 677). Treating notes state that she appeared anxious and depressed (Tr. 677-678). Treating notes state that Plaintiff experienced stress due to family issues (Tr. 678). Also in April, 2011, neurosurgeon David D. Udehn, M.D. examined Plaintiff, noting her report of radiating back pain since a 2004 car accident (Tr. 421, 658). He ordered imaging studies of the lumbar spine (Tr. 430). An MRI of the lumbar spine showed no nerve root compression (Tr. 428-429). In May and June, 2011, Zaza Godziashvili, M.D. administered lumbar spine steroid injections (Tr. 401, 405, 507-508).

Plaintiff reported a 30 percent reduction in pain 10 minutes after the injection (Tr. 507). Dr. Godziashvili recommended physical therapy after Plaintiff's pain was "under control" (Tr. 507). She found that Plaintiff could resume her normal work duties but was restricted to 20 pounds lifting (Tr. 511). June, 2011 treating notes by Sheryl Hasegawa, D.O. state that Plaintiff complained of renewed back pain after injuring her back (Tr. 398). The same month, Dr. Godziashvili administered an additional steroid injection (Tr. 514). She prescribed a TENS unit (Tr. 516). Employee assistance counseling notes from the same month state that Plaintiff had "multiple issues" including pain and substance abuse (Tr. 679).

In September, 2011, Plaintiff sought emergency treatment for weakness and back pain (Tr. 518). She reported that she had run out of narcotic pain medication (Tr. 518). She was administered Dilaudid, and upon discharge was prescribed Percocet (Tr. 518-519, 522, 533). An October, 2011 CT of the lumbar spine showed no significant changes from earlier imaging studies (Tr. 426, 553). Dr. Udehn's notes from the same month state that Plaintiff lost her health insurance and was now unable to receive treatment from Dr. Godziashvili (Tr. 550). Plaintiff complained of left buttock and lateral thigh pain causing difficulty going up and down stairs (Tr. 550-551, 663-664). Dr. Udehn found that Plaintiff was limited to sitting for 15 minutes an hour and was required to lie down for 20 minutes each hour (Tr. 551, 664, 668). Dr. Udehn opined that Plaintiff was unable to perform any work (Tr. 668).

September, 2011 psychological intake records by therapist Cara Schade state that Plaintiff exhibited a flat affect with an anxious mood (Tr. 432). Plaintiff reported depression

-6-

and anxiety (Tr. 432).   She reported that she was in the process of divorcing her physically abusive husband (Tr. 433, 556).   She reported that ongoing back pain was improved with steroid injections but that she was unable to continue treatment due to insurance changes (Tr. 434).   Intake notes state that Plaintiff was fully oriented with good grooming and dress (Tr. 435).   Plaintiff reported that her primary care specialist prescribed psychotropic medication (Tr. 435).   She admitted to alcohol abuse and former cocaine abuse (Tr. 435, 556, 566).   She was assigned a GAF of 43 due to depression, Post Traumatic Stress Disorder ("PTSD"), alcohol abuse, and chronic back pain[2] (Tr. 437, 557).

A November, 2011 Mental Residual Functional Capacity Assessment by Nurse Practitioner Jennifer Kreiner found moderate limition in the ability to understand locations and remember or carry out detailed instructions with marked limitation in the ability maintain attention for extended periods (Tr. 560).   She  deemed Plaintiff markedly limited in the ability to work within a schedule, work without supervision, interact with the general public, get along with coworkers, or use public transportation (Tr. 561).   Therapist Schade's November, 2011 records note reduced psychological symptoms (Tr. 454-455).   The later November, 2011 records state that Plaintiff was frustrated with her younger daughter's behavioral problems (Tr. 451).   Medical records from the same month note that Plaintiff's

---

[2]

A GAF score of 41-50 indicates "[s]erious symptoms ... [or] serious impairment in social, occupational, or school functioning," such as inability to keep a job. *DSM–IV–TR* at 34. *Diagnostic and Statistical Manual of Mental Disorders–Text Revision*, 34 (*"DSM–IV–TR"* ) (4th ed.2000).

current primary care provider was Ann Connaghan, M.D. (Tr. 684). Plaintiff reported that the back condition caused stabbing pain, tenderness, and muscle tightness (Tr. 686). She reported that she typically arose at 6:15 a.m. but took numerous breaks during the day (Tr. 687).

In December, 2011 therapist Schade encouraged Plaintiff to better her situation with behavioral changes (Tr. 450). N.P. Kreiner's notes from the same month state that Plaintiff had a steady gait, good grooming, and a depressed affect (Tr. 570). She reported good results from Cymbalta (Tr. 570). The same month, Sam Morkos, M.D. examined Plaintiff, noting her report of lower extremity radiculopathy (Tr. 670). He referred her for epidural steroid injections (Tr. 671-672).

In January, 2012 therapist Schade encouraged Plaintiff to enroll in outpatient substance abuse treatment (Tr. 446). Plaintiff expressed concern that her recent diagnosis of depression (as opposed to bipolar disorder) would negatively impact her application for disability benefits, but was encouraged by Schade to focus on treatment (Tr. 447). Therapist Schade's treating notes from the same month state that Plaintiff was charged with driving under the influence (Tr. 462).

In March, 2012 Dr. Connaghan noted Plaintiff's reports of radiating back pain and the conditions of "likely" fibromyalgia and alcoholism (Tr. 732). March, 2012 records by N.P. Kreiner state that Plaintiff resumed drinking two weeks earlier after a period of sobriety (Tr. 572). Notes from a home visit also state that Plaintiff had resumed drinking and that her

-8-

mental status had regressed (Tr. 590). Therapist Schade urged Plaintiff to continue with her participation in the "Work First" program (Tr. 591). Notes from later the same month state that Plaintiff had again abstained from alcohol and was appropriately dressed with a normal affect and mood (Tr. 576). In response to a March, 2012 request from the Department of Human Services, Dr. Connaghan reported that Plaintiff "states she is unable to sit for any length of time due to chronic pain. We are in the process of trying to get the problems managed. Until then, patient is unable to participate in Work First program" (Tr. 674).

In April, 2012, Dr. Connaghan noted that Plaintiff had a stooped posture while standing (Tr. 737). An x-ray of the left hip was unremarkable (Tr. 775). April, 2012 home visit notes state that Plaintiff was intoxicated and admitted that she had been drinking until 2:00 a.m. the night before (Tr. 600-601). She was referred to an inpatient detox program (Tr. 601). Notes from later the same month state that Plaintiff checked out of inpatient treatment because she felt that she could detox as an outpatient (Tr. 603). N.P. Kreiner's May, 2012 notes state that Plaintiff again exhibited a normal mood and affect but admitted that she was drinking on weekends (Tr. 578). June, 2012 records by Cara Schade state that Plaintiff felt "better" living in a homeless shelter because she could focus on her own rehabilitation (Tr. 613). Plaintiff was diagnosed with alcoholic pancreatitis, alcoholic gastritis, and alcoholism (Tr. 741). She reported that she had been jailed for failing to make a court appearance (Tr. 613). Notes from later the same month state that Plaintiff was looking for work (Tr. 619). The following month, Dr. Connaghan noted the conditions of

-9-

chronic pain and opioid dependence (Tr. 745-746). Plaintiff demonstrated a limited range of lumbar spine motion but full muscle strength (Tr. 748-749). The following month, Dr. Connaghan noted a normal mood and affect (Tr. 752, 755, 761). August, 2012 records state that a therapy session was canceled because Plaintiff was incarcerated (Tr. 627).

An October, 2012 summary states that Plaintiff, recently released from jail, was staying at a shelter while her children stayed with others (Tr. 628). Treating observations state that she was dressed appropriately with fair grooming and hygiene (Tr. 629). She did not exhibit memory problems (Tr. 629). She stated that she was interested in securing either employment or disability and had "been linked with vocational services" (Tr. 629). Cynthia Alley assigned her a GAF of 43 (Tr. 630). Notes from later the same month state that Plaintiff was working (Tr. 635). Barriers to Plaintiff's goals were identified as recent incarceration for alcohol related offenses, alcoholism, family conflicts, loss of her driver's license, legal issue, impulsivity, poor judgment, and "racing thoughts" (Tr. 638). November, 2012 records state that Plaintiff was working part-time but was otherwise bored (Tr. 579). She reported that after one week on the job, she was already having "difficulty with" her employer (Tr. 641). Records from the following month state that Plaintiff had resumed drinking and also, had lost her job due to transportation problems (Tr. 581, 654-646).

In January, 2013, Katherine Chamberlain, M.D. noted that Plaintiff exhibited a logical and goal directed thought process (Tr. 583). Home visit records state that Plaintiff was attempting to finding employment (Tr. 649). The same records state that the home

"smelled strongly of musty alcohol" (Tr. 649).   Therapist Schade's records from the same month state that Plaintiff had begun drinking again (Tr. 650).   In March, 2013, therapist Schade completed an assessment of Plaintiff's work-related abilities, finding moderate limitation in following rules, using judgment, dealing with stress, following detailed instructions, and acting predictably; and marked limitation in interacting with coworkers and the public and behaving in an emotionally stable manner (Tr. 651-652).   Schade found extreme limitations in interacting with supervisors and "reliability" (Tr. 651-652). She found that Plaintiff experienced moderate limitation in activities of daily living, social functioning and in concentration persistence, or pace with "one or two" episodes of decompensation (Tr. 652).   A March, 2013 medication review by Dr. Chamberlain states she had written a note on Plaintiff's behalf to excuse her from the Work First requirements until Plaintiff was "caught up and in control" (Tr. 696).   Dr. Chamberlain's notes reference a GAF of 43 assigned in September, 2011 (Tr. 697).   N.P. Kreiner's notes from the following month state that Plaintiff had not used alcohol in more than three months and was volunteering a few hours each week at the Salvation Army (Tr. 698).   N.P. Kreiner declined to fill out a form rating Plaintiff's work-related mental abilities, instead referring to treating records created from October, 2011 forward (Tr. 705-707, 708-729)(see above).

### 2.  Non-Treating Sources

In March, 2012, Mark Zaroff, Ph.D. conducted a consultative psychological examination on behalf of the SSA, noting Plaintiff's report of frequent panic attacks,

-11-

difficulty holding a job, and anxiety (Tr. 469). Plaintiff acknowledged that she missed a number of therapy appointments since beginning treatment in November or December, 2011 (Tr. 469). She admitted to a history of substance abuse and that she had been the victim of childhood sexual abuse (Tr. 470). She admitted to an arrest for Driving Under the Influence ("DUI") (Tr. 470). Plaintiff reported that she got up as early as 6:30 a.m. to prepare her daughter for school and spent her day doing chores, cooking, and spending time with her 10-year-old (Tr. 471). She denied hallucinations and exhibited "well organized" thoughts (Tr. 471). Dr. Zaroff noted the "main diagnoses" of depression, PTSD, and alcohol abuse (Tr. 473). Dr. Zaroff assigned Plaintiff a GAF of 43, noting that she would require "significant support and structure to be able to fully recover from her current psychiatric conditions" (Tr. 473).

In April, 2012, A. Neil Johnson, M.D. performed a consultative physical examination on behalf of the SSA, noting Plaintiff's report of PTSD, bipolar, panic attacks, and depression (Tr. 475). Plaintiff reported a right ankle fracture in a 2004 head-on car accident (Tr. 475). She also reported mild right shoulder pain, noting that she had undergone right rotator cuff surgery in 2007 (Tr. 475). She indicated that most limiting condition was back pain, noting level "6-7" pain on a scale of 1 to 10 and the inability to lift more than 10 pounds without pain (Tr. 475). She noted a recent diagnosis of fibromyalgia (Tr. 475).

Dr. Johnson noted a "mild limp to the right" and moderate difficulty getting off the exam table and in tandem walking (Tr. 476). He noted that she experienced "severe"

-12-

difficulty squatting" (Tr. 476).   He observed that Plaintiff did not exhibit difficulty performing fine manipulations but exhibited "pain on motion of the back, right shoulder, both hips, both knees, [and] both ankles" (Tr. 476).

In April, 2012, Joe DeLoach, Ph.D. performed a non-examining review of the treating and consultative records, finding that as a result of affective, anxiety-related, and substance addiction disorders, Plaintiff experienced mild limitation in activities of daily living and moderate limitation in social functioning and concentration, persistence, or pace (Tr. 102, 107-108).

The same month, Jerry Evans, M.D. performed a non-examining review of the records pertaining to Plaintiff's physical conditions, finding that Plaintiff could lift or carry 10 pounds occasionally and "less than 10 pounds" frequently; stand or walk for six two hours and sit for six in an eight-hour workday; and push and pull without limitation (Tr. 104).   He found that Plaintiff was limited to occasional stair climbing, stooping, kneeling, crouching, and crawling; frequent balancing; and precluded from all climbing of ladders, ropes, or scaffolds (Tr. 105).   Dr. Evans found that Plaintiff was limited to occasional overhead reaching and handling in the left upper extremity (Tr. 105).   He found that due to the use of narcotic pain medication, Plaintiff should avoid concentrated exposure to vibration and avoid all exposure to hazards (Tr. 106).

-13-

### 3. Records Submitted After the June 28, 2013 Decision (Tr. 776-790)[3]

On August 18, 2013, Plaintiff sought emergency treatment for "new onset of back pain, weakness and numbness down the left leg" (Tr. 777). An MRI of the lumbar spine showed a bluging disc at L3-L4 with possible nerve root effacement (Tr. 777-778). In November, 2013, Ravi Lakkaraju, M.D. examined Plaintiff, noting her report of left leg weakness (Tr. 780-781). He noted that the August, 2013 MRI showed a cyst at L1-L2 showing nerve root involvement (Tr. 781). He observed an abnormal gait (Tr. 782). He prescribed Nucynta for the spine condition along with low back exercises, and referred her for a neurosurgical consultation (Tr. 782). Plaintiff admitted to occasional alcohol use (Tr. 789). An EMG showed left L2 radiculopathy (Tr. 783). The following month, neurosurgeon

---

[3]

These records were not among those considered by the ALJ (Tr. 6). Under 42 U.S.C. § 406(g), records submitted after the administrative decision are subject to a narrow review by the reviewing court. *Cotton v. Sullivan,* 2 F.3d 692, 696 (6th Cir.1993). To establish grounds for a Sentence Six remand, the claimant must show that the "new evidence is material and that there is good cause for the failure to incorporate such evidence into the record in a prior proceeding ... " § 405(g). While Plaintiff makes seven separate arguments for remand, she does argue that the newer evidence is likely to change that ALJ's decision.

My own review of the records show that a "Sentence Six" remand is not warranted. The earliest records an emergency room study dated August, 19, 2013 - approximately eight weeks after the administrative decision at which time Plaintiff complained of a "new onset of back pain, weakness and numbness down the left leg for one to two weeks" (Tr. 777). Because the August, 2013 symptoms began well over a month after the administrative decision, it is not material to the ALJ's finding that Plaintiff was disabled as of June 28, 2013. *See  See Sizemore v. Sec'y of Health & Human Servs.,* 825 F.2d 709, 712 (6th Cir. 1988)(where a claimant's condition has worsened since the administrative decision, the proper remedy is to initiate a new claim for benefits rather than seek a Sentence Six remand).

-14-

Srinivasachari Chakravarthi, M.D. opined that Plaintiff's condition would not be improved with surgery (Tr. 786). He recommended weight loss, pain medication, physical therapy, and swimming (Tr. 786).

### C. Vocational Testimony

VE Lyon classified Plaintiff's former work as retail sales clerk as semiskilled and exertionally light; phlebotomy positions, semiskilled, light; and administrative assistant (as described by Plaintiff) semiskilled/light[4] (Tr. 89-90).

The ALJ then described a hypothetical individual of Plaintiff's age, education, and work experience:

> [T]his individual would be limited to sedentary exertional work, they could only occasionally operate foot controls, they could never perform overhead reaching with the left upper extremity. They would be limited to frequent, as opposed to constant, handling, fingering, and feeling with the left upper extremity. They would have to avoid exposure to ladders and scaffolds, they could never kneel or crawl, they could not work around unprotected heights, moving mechanical parts, or occupational vibration. They would be limited to simple, routine and repetitive tasks, simple work related decisions, and no more than occasional interaction with co-workers and the public. With those restrictions, would there be any past work that such an individual could perform? (Tr. 91).

---

[4]

20 C.F.R. § 404.1567(a-d) defines *sedentary* work as "lifting no more than 10 pounds at a time and occasionally lifting or carrying articles like docket files, ledgers, and small tools; *light* work as "lifting no more than 20 pounds at a time with frequent lifting or carrying of objects weighing up to 10 pounds;" *medium* work as "lifting no more than 50 pounds at a time with frequent lifting or carrying of objects weighing up to 25 pounds;" and that exertionally *heavy* work "involves lifting no more than 100 pounds at a time with frequent lifting or carrying of objects weighing up to 50 pounds. *Very Heavy* work requires "lifting objects weighing more than 100 pounds at a time with frequent lifting or carrying of objects weighing 50 pounds or more. § 404.1567(e).

The VE responded that the above limitations would preclude Plaintiff's past relevant work but would allow the above-described individual to perform the sedentary work of an assembler (800 positions in the regional economy); packager (2,000); and inspector (600) (Tr. 91-92). The VE testified further that if the same individual were off task for 25 percent of the workday, or, were required to spend 25 percent of the workday reclining with her feet elevated, all work would be precluded (Tr. 92). The VE stated that her job testimony was consistent with the *Dictionary of Occupational Titles* ("*DOT*") and was further supplemented by information drawn from her "work experience and knowledge of the labor market . . ." (Tr. 93).

### D. The ALJ's Decision

Citing the medical records, ALJ O'Leary found that Plaintiff experienced the severe impairments of "degenerative disc disease with radiculopathy, neuropathy, osteoarthritis, history of a right ankle fracture status-post repair, history of a right rotator cuff tear status-post repair, fibromyalgia, varicose veins, obesity, an affective disorder, an anxiety disorder, and alcohol dependence," but found that the conditions did not meet or medically equal a listed impairment found in 20 C.F.R. Part 404, Subpart P, Appendix 1 (Tr. 26). The ALJ found that Plaintiff experienced mild limitation in activities of daily living and moderate limitation in social functioning and concentration, persistence, or pace (Tr. 27-29). The ALJ determined that Plaintiff had the Residual Functional Capacity ("RFC") for sedentary work with the following additional restrictions:

[C]ould only occasionally operate foot controls. She must never perform overhead reaching with the left upper extremity. She is limited to frequent, as opposed to constant, handling, fingering, and feeling with the left upper extremity. She would have to avoid exposure to ladders and scaffolds. She could never kneel or crawl. She could not work around unprotected heights, moving mechanical parts, or occupational vibration. She would be limited to simple, routine, repetitive tasks. She is limited to simple work-related decisions. She must have no more than occasional interaction with coworkers and supervisors (Tr. 31).

Citing the VE's testimony, the ALJ determined that while Plaintiff was unable to perform her past relevant work, she could work as an assembler, packager, or inspector (Tr. 52-53).

The ALJ discounted the allegations of disability, citing Plaintiff's acknowledgment that she was able to prepare her daughter for school, prepare meals for her children, and help them with their homework (Tr. 46). The ALJ cited December, 2012 treatment notes stating that Plaintiff was not working due to transportation problems (Tr. 47). The ALJ noted that as of January, 2013, Plaintiff was applying for jobs (Tr. 47). The ALJ accorded "significant weight" to Dr. Evans' April, 2012 finding that Plaintiff was capable of a range of sedentary work (Tr. 47). She accorded "significant weight" to Dr. DeLoach's April, 2012 finding that Plaintiff was capable of "simple and repetitive tasks on a sustained basis" (Tr. 47).

### III.   STANDARD OF REVIEW

The district court reviews the final decision of the Commissioner to determine whether it is supported by substantial evidence. 42 U.S.C. §405(g); *Sherrill v. Secretary of Health and Human Services,* 757 F.2d 803, 804 (6th Cir. 1985). Substantial evidence is more

than a scintilla but less that a preponderance.  It is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales,* 402 U.S. 389, 401, 91 S.Ct. 1420, 28 L.Ed.2d 842 (1971) (*quoting Consolidated Edison Co. v. NLRB,* 305 U.S. 197, 229, S. Ct. 206, 83 L.Ed.126 (1938)).  The standard of review is deferential and "presupposes that there is a 'zone of choice' within which decision makers can go either way, without interference from the courts." *Mullen v. Bowen,* 800 F.2d 535, 545 (6th Cir. 1986)(en banc).  In determining whether the evidence is substantial, the court must "take into account whatever in the record fairly detracts from its weight." *Wages v. Secretary of Health & Human Services*, 755 F.2d 495, 497 (6th Cir. 1985). The court must examine the administrative record as a whole, and may look to any evidence in the record, regardless of whether it has been cited by the ALJ. *Walker v. Secretary of Health and Human Services*, 884 F.2d 241, 245 (6th Cir. 1989).

### IV.    FRAMEWORK FOR DISABILITY DETERMINATIONS

Disability is defined in the Social Security Act as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. §423(d)(1)(A). In evaluating whether a claimant is disabled, the Commissioner is to consider, in sequence, whether the claimant: 1) worked during the alleged period of disability; 2) has a severe impairment; 3) has an impairment that meets or equals the requirements of an impairment

-18-

listed in the regulations; 4) can return to past relevant work; and 5) if not, whether he or she can perform other work in the national economy.  20 C.F.R. §416.920(a).  The Plaintiff has the burden of proof at steps one through four, but the burden shifts to the Commissioner at step five to demonstrate that, "notwithstanding the claimant's impairment, he retains the residual functional capacity to perform specific jobs existing in the national economy." *Richardson v. Secretary of Health & Human Services,* 735 F.2d 962, 964 (6th Cir.1984).

## V. ANALYSIS[5]

Plaintiff makes seven arguments in favor of remand.[6]  *Plaintiff's Brief,* 7-24, *Docket #16.*  First, Plaintiff faults the ALJ for according "little weight" to N.P. Kreiner's November, 2011 assessment. *Id.* at 7-11.  Next, she takes issue with the rejection of therapist Schade's March, 2013 finding of marked and extreme work-related limitations.  *Id.* at 12-13.  Third, she disputes the ALJ's rejection of Dr. Udehn's October, 2011 opinion that Plaintiff was unable to sit for more than 15 minutes every hour and was required to lied down for 20

---

[5]Any issue not raised directly by Plaintiff is deemed waived. *United States v. Campbell,* 279 F.3d 392, 401 (6th Cir.2002).

[6] Plaintiff's brief, while purportedly conforming to the 25-page limit, is accompanied by a 28-page "Abstract of Medical Record," which discusses in narrative form the medical records contained in the administrative transcript. I note that the Statement of Facts and Proceedings in Plaintiff's brief contains no reference to any medical records. In effect, then, Plaintiff's "Abstract" *is* a statement of facts that improperly extends the page count to more than double the permissible limit. I have cautioned Plaintiff's counsel in previous cases about his penchant for exceeding the page limit without requesting leave of the Court, and I am troubled by this rather transparent attempt to circumvent the rules in this case. Counsel is advised the inclusion of "abstracts" or any other mechanisms employed to avoid complying with this Court's Local Rules will result in the brief being stricken and sanctions being imposed.

minutes every hour. *Id.* at 13-17.   In her fourth argument, Plaintiff likewise disputes the rejection of Dr. Connaghan's March 28, 2012 letter stating that Plaintiff should be excused from attending the Work First program. *Id.* at 17-18.  Fifth, she argues that the ALJ erred by failing to accord weight to the GAF scores of 43 as stated in the September, 2011through April, 2013 psychological treating records. *Id.* at 18-20.  Sixth, she faults the ALJ for giving "little weight" to Dr. Zaroff's March, 2012 consultative findings. *Id.* at 20-22.  Finally, in her seventh argument, she disputes the finding that her unsuccessful work attempts of October and November, 2012 support the contention that she was capable of performing full-time work. *Id.* at 22-23.

Because Plaintiff's GAF score argument (Argument V) and the "unsuccessful work attempt" argument (Argument VII) have some bearing on the remaining arguments, they are considered first.

### A.   GAF Scores (Argument V)

 Plaintiff contends, in effect, that the ALJ erred by failing to credit the GAF score of 43 assigned by various sources between September, 2011 and April, 2013. *See fn 2, above* (GAF between 41 and 50 reflects "serious" psychological symptoms).  She argues that the ALJ failed to provide adequate reasons for rejecting the GAF of 43.

Plaintiff's argument that the ALJ erred by failing to accord any weight to the GAF score of 43 is not well taken.  First, while Plaintiff cites 13 separate treating records showing a GAF of 43, all but one of them indicate that the "43" was simply a restatement of the GAF

assigned at the September, 2011 assessment (Tr. 437, 567, 571, 573, 575, 577, 580, 582, 584, 697, 699). While the remaining record, created in October, 2012, does not reference the September, 2011 assessment, it is unclear whether the GAF of 43 listed in that document actually reflects a new assessment or was simply drawn from September, 2011 records (Tr. 628-630).

Further, an ALJ is not required to accord the any weight to a GAF score or explain her reasons for discounting it. "A GAF score is ... not dispositive of anything in and of itself, but rather only significant to the extent that it elucidates an individual's underlying mental issues." *Oliver v. Commissioner of Social Sec.*, 415 Fed.Appx. 681, 684, 2011 WL 924688, *4 (6th Cir. March 17, 2011) (*citing White v. Commissioner of Social Sec.*, 572 F.3d 272, 284 (6th Cir.2009)); *See also Howard v. Comm'r of Soc. Sec.*, 276 F.3d 235, 241 (6th Cir.2002) ("[W]e are not aware of any statutory, regulatory, or other authority requiring the ALJ to put stock in a GAF score in the first place"). "While a GAF score may be of considerable help to the ALJ in formulating the RFC, it is not essential to the RFC's accuracy." *Howard*, at 241. "GAF scores are 'for planning treatment,' and are measures of both severity of symptoms and functional level." *Denton v. Astrue,* 596 F.3d 419, 425 (7th Cir. 2010)(*citing DSM-IV.* at 32). "Because the 'final GAF rating always reflects the worse of the two,' . . . the score does not reflect the clinician's opinion of functional capacity." *Id.* (*citing DSM-IV* at 33).

Moreover, while an ALJ is not required to discuss the GAF scores, in this case, the ALJ articulated her reasons for discounting the scores, noting that GAF scores reflected a

-21-

claimant's "level of functioning or symptoms only at the time of evaluation" (Tr. 51).

Further, the records cited above show that alcohol abuse contributed significantly to

Plaintiff's functional limitations and to the low GAF score. As the ALJ noted, while the

alcohol dependence was a severe impairment, it was "not material to the determination of

disability" (Tr. 46). *See* 42 U.S.C. § 423(d)(2)(C)("An individual shall not be considered to

be disabled for purposes of this subchapter if alcoholism or drug addiction would . . . be a

contributing factor material to the Commissioner's determination that the individual is

disabled"). In other words, to the extent that the low GAFs reflected Plaintiff's alcoholism,

they cannot be used to show disability.

### B.  Unsuccessful Work Attempts (Argument VII)

Plaintiff takes issue with the finding that her work activity after the alleged onset

disability date "indicate that [her] daily activities have, at least at times, been somewhat

greater than [she] has reported" (Tr. 47). *Plaintiff's Brief* at 22-24. She argues that "[t]he

only valid use of evidence of an unsuccessful work attempt . . . is as evidence of an inability

to engage in substantial gainful activity during the time frame of the unsuccessful work

attempt." *Id.* at 24; 20 C.F.R. § 4041574(c).

"Unsuccessful work attempts," as defined by 20 CFR § 404.1574(c), pertain to failed

attempts to rejoin the work force after the alleged onset of disability. *See* Programs

Operations Manual System ("POMS") DI § 24005.001 ("When the work issue determination

prepared by the [field officer] shows that the claimant engaged in [work activity] after the

alleged onset date ... but subsequently ceased ... the [field officer] will develop the facts and make a recommendation as to whether it was an unsuccessful work attempt.")  Section 404.1574(c) states in regard to unsuccessful work attempts that "work you have done will not show that you are able to do substantial gainful activity if, after working for a period of six months or less, *your impairment* forced you to stop working or to reduce the amount of work" to levels below substantial gainful activity.  *Id.* (Emphasis added).

The ALJ's finding that Plaintiff's work activity after the alleged onset date undermined her allegations does not provide grounds for remand.  First, the ALJ acknowledged that the 2012 work attempts did not constitute substantial gainful activity (Tr. 25).  The primary purpose of finding that work activity occurring after the alleged onset date was an "unsuccessful work attempt" rather than substantial gainful activity, "is to provide 'an equitable means of disregarding relatively brief work attempts' that do not demonstrate sustained substantial gainful activity." *Hays v. Apfel*, 1999 WL 450902, *6 (D.Kan. May 10, 1999) (citing SSR 84–25, 1984 WL 49799 (1984).

Second, the ALJ did not err in finding that the work activity tended to undermine Plaintiff's allegations of limitation.  Plaintiff contends that her work attempts were improperly used to discount her allegations of disability, contrary to the language of § 404.1574(c), which states that an unsuccessful work attempt cannot be used to show that a claimant is capable of full-time work.  However, under the same subsection, unsuccessful work attempts, by definition, require the Plaintiff to show that her impairments, rather than

-23-

logical problems, "forced" her to stop working. § 404. 1574(c).  The ALJ cited December, 2012 treating records showing that at least a portion of the work activity was not terminated as a result of Plaintiff's physical or psychological limitations but rather, because she did not have transportation (Tr. 47, 581, 654-646).  Because the work was terminated as a result of transportation problems rather than an impairment, it does not constitute an unsuccessful work attempt as defined by the Regulation.  Because substantial evidence shows that transportation problems, rather than work-related impairments, forced Plaintiff to terminate at least a portion of the post-onset work activity, the ALJ did not err in noting that the activity stood at odds with her claims that she lacked the physical ability to perform even sedentary work (Tr. 47).

### C.   Weight Accorded to the Various Sources (Arguments I-IV, VI)

### 1.   N.P. Kreiner (Argument I)

Plaintiff argues that the ALJ's reasons for discounting N.P. Kreiner's November, 2011 findings of marked psychological limitations were "conclusory." *Plaintiff's Brief,* 7-11.  She faults the ALJ for discounting N.P. Kreiner's findings because they were presented in a "checklist" format.  *Id.* at 8.  She argues that [t]he format in which an acceptable medical source presents her opinions is not a factor" to be considered in weighing the opinion.  *Id.* at 8-10; SSR 06-3p.  She argues that N.P. Kreiner's assessment is supported by the findings other treating sources.  *Id.* at 11.

Kreiner, a nurse practitioner, is not an "acceptable medical source," 20 C.F.R. §§

-24-

404.1502, 404.1513(a). Nonetheless, her opinion "is entitled to consideration due to [her] expertise and long-term relationship" with Plaintiff. *Cole v. Astrue,* 661 F.3d 931, 939 (6th Cir. 2011); 20 C.F.R. § 404.1513(d)(1). In weighing the opinions of "other sources," it is "appropriate to consider such factors as the nature and extent of the relationship, whether the evidence is consistent with other evidence, and any other factors that tend to support or refute the evidence." SSR 06–3p at *2. The Ruling notes the increasing significance of "other" medical sources in the disability determination:

> With the growth of managed health care in recent years and the emphasis on containing medical costs, medical sources who are not "acceptable medical sources," such as nurse practitioners, physician assistants, and licensed clinical social workers, have increasingly assumed a greater percentage of the treatment and evaluation functions previously handled primarily by physicians and psychologists. Opinions from these medical sources, who are not technically deemed 'acceptable medical sources' under our rules, are important and should be evaluated on key issues such as impairment severity and functional effects, along with the other relevant evidence in the file. *Id.* at *4.

The Ruling states further, "The evaluation of an opinion from a medical source who is not an 'acceptable medical source' depends on the particular facts in each case. Each case must be adjudicated on its own merits based on a consideration of the probative value of the opinions and a weighing of all the evidence in that particular case." *Id.* at *5.

Contrary to Plaintiff argument, the limited weight accorded N.P. Kreiner's November, 2011 opinion is well supported and explained.  The ALJ discussed Dr. Kreiner's findings of moderate and marked psychological limitation in detail (Tr. 49, 560-561).  The ALJ found that N.P. Kreiner's assessment was not supported by the "objective findings and the

longitudinal treatment" (Tr. 49). While Plaintiff dismisses these findings as "conclusory," they are prefaced by a exhaustive, nine-page discussion of the treating records (Tr. 38-47), including evidence showing the effects of alcohol abuse on the work-related abilities (Tr. 44-47) and Plaintiff's activities of daily living (Tr. 46-47).

The ALJ noted treating records from the same month as N.P. Kreiner's assessment stated that Plaintiff's depression had decreased and that she was cooperative and well groomed (Tr. 39). The ALJ noted that an emergency room evaluation from the same period showed "normal cognition, mood, and affect" (Tr. 40). The ALJ noted that while the 2012 and 2013 records show that Plaintiff's mental condition waxed and waned, her psychological and personal crises were largely precipitated by alcohol abuse (Tr. 44-46). The ALJ pointed out that treating records pertaining to the physical symptoms showed "a normal mood and affect" (Tr. 41). The ALJ noted that Plaintiff's regular activities for the period under consideration included preparing her daughter for school, making meals, and volunteering on a sporadic basis (Tr. 46).

Further, the ALJ did not err in finding that N.P. Kreiner's checklist evaluation was "not as persuasive as an in-depth written analysis" discussing "the basis behind the opinion" (Tr. 49). *See Doyle v. Commissioner of Social Sec.,* 2012 WL 4829434, *9 (E.D.Tenn. September 21, 2012)(*citing Mason v. Shalala,* 994 F.2d 1058, 1065–66 (3d Cir.1993)("'Form reports in which a physician's obligation is only to check a box or fill in a blank are weak evidence at best ... where these so-called reports are unaccompanied by thorough written

-26-

reports, their reliability is suspect.'")(internal quotations and citation omitted)).

### 2. Therapist Schade (Argument II)

The ALJ's reasons for according only "limited weight" to therapist Schade's March, 2013 checklist assessment are likewise well supported and explained. The ALJ found that Schade's finding of marked and extreme limitations stood at odds with the transcript as a whole showing that Plaintiff was able to interact appropriately and perform a range of daily activities at the times she was not drinking (Tr. 44-47, 49-50, 651-652). The ALJ permissibly found that the checklist assessment did not carry as much weight as a written report (Tr. 50). The ALJ correctly noted that therapist Schade's finding of marked and extreme limitations was inconsisten with her conclusions (found elsewhere in the same report) that Plaintiff experienced only moderate limitation in activities of daily living, social functioning, and concentration, persistence, and pace (Tr. 652). Therapist Schade's extreme findings are also undermined by her own recommendation to Plaintiff to continue participating in the Work First program (Tr. 591). While Plaintiff's October and November, 2012 work activity did not amount to substantial gainful activity, the treating notes from those months and January, 2013 indicate that Plaintiff was encouraged to seek employment opportunities (Tr. 629, 635, 641, 649). Therapist's Schade's belief that Plaintiff was capable of obtaining gainful employment stands at odds with her findings of "extreme" psychological limitation.

Plaintiff also argues that the ALJ erred by instead giving "considerable weight" to Dr.

DeLoach's April, 2012 non-examining finding of the ability to perform simple work in small groups (Tr. 107-108). She argues that Dr. DeLoach did not have benefit of the later treating records (Tr. 107-108). *Plaintiff's Brief* at 13. However as discussed in **II-B**, *above,* the later treating records (aside from evidence that Plaintiff personal problems were created or exacerbated by continued alcohol abuse) do not show that her mental condition deteriorated significantly in the remainder of 2012 and 2013.

### 3. Dr. Udehn (Argument III)

Plaintiff also faults the ALJ for failing to credit Dr. Udehn's September and October, 2011 findings that she was limited to sitting 15 minutes an hour and needed to recline 20 minutes of every hour (Tr. 413, 416). *Plaintiff's Brief* at 13-17. She disputes the ALJ's finding that the September and October, 2011 reflects an exacerbation of the back condition and instead, supports the finding that she experienced chronic limitations. *Id.*

Plaintiff's undeveloped argument that the ALJ did not comply with the procedural aspects of the treating physician analysis or was based on an erroneous reading of the record is without merit. *Id.* at 15. Consistent with the requirements of 20 C.F.R. § 1527(c), the ALJ noted that Dr. Udehn was a neurologist and a treating source (Tr. 50) and that Plaintiff received treatment from him as of April, 2011 (Tr. 35). The ALJ noted that treatment notes from the same month showed a normal gait, station, and range of motion (Tr. 35). She noted that an MRI showed that the lumbar spine condition was stable since an earlier study (Tr. 35). The ALJ noted that Plaintiff exhibited a steady gait in October and December, 2011 and in

-28-

March, May, November, and December, 2012 (Tr. 36).  The ALJ permissibly rejected Dr. Uehn's assessment because it was contradicted by the "objective examination findings and diagnostic imaging studies" as discussed earlier in the opinion (Tr. 50).


### 4.  Dr. Connaghan

For overlapping reasons, the ALJ's finding that Dr. Connaghan's opinion was entitled to "little weight" does not provide grounds for remand.  The ALJ noted that Dr. Connaghan was a treating physician, but determined that her opinion that Plaintiff was "unable to sit for any length of time due to chronic pain" was contradicted by the bulk of the treating and consultative records  (Tr. 35-37, 50, 674).   The ALJ did not err in concluding that Dr. Connaghan's letter (indicating that Plaintiff "states" that she was unable to sit for any length of time) suggested that the opinion was based solely on Plaintiff's subjective complaints (Tr. 674).

### 5.  Dr. Zaroff (Argument VI)

Likewise, the ALJ's finding that Dr. Zaroff's March, 2012 consultative psychological report was entitled to only "some weight" weight is supported substantial evidence (Tr. 469-473).  Plaintiff argues that the ALJ erred by failing to credit Dr. Zaroff's finding of a poor prognosis and a GAF of 43.  *Plaintiff's Brief* at 20-22.

Because Dr. Zaroff was a one-time consultative source, his opinion was "entitled to no special degree of deference." *Barker v. Shalala*, 40 F.3d 789, 794 (6th Cir.1994).

-29-

Moreover, the ALJ provided an thorough and accurate summation of Dr. Zaroff's findings (Tr. 48).   As the ALJ discussed, she was not required put any stock in the GAF score (Tr. 48).   Further, the GAF score in this instance has particularly little probative value given that Dr. Zaroff's factored in Plaintiff's alcohol abuse and resulting legal problems in arriving at the GAF of 43 (Tr. 473).   Likewise, Dr. Zaroff's finding that Plaintiff would require "significant support and structure" to recover from her conditions (Tr. 473) appear to reference, in large part, her interpersonal and legal problems created by alcohol abuse.

My recommendation to uphold the Commissioner's decision on this application is not intended to trivialize the Plaintiff's personal problems or medical conditions.   Nonetheless, the ALJ's determination that she is not disabled from all gainful employment is within the "zone of choice" accorded to the fact-finder at the administrative hearing level and should not be disturbed by this Court.   *Mullen v. Bowen*, *supra*.

## VI.   CONCLUSION

For these reasons, I recommend that Defendant's Motion for Summary Judgment [Docket #22] be GRANTED and that Plaintiff's Motion for Summary Judgment [Docket #16] be DENIED.

Any objections to this  Report and Recommendation must be filed  within 14 days of service of a copy hereof as provided for in 28 U.S.C. §636(b)(1) and E.D. Mich. LR 72.1(d)(2).   Failure to file specific objections constitutes a waiver of any further right of appeal.  *Thomas v. Arn,* 474 U.S. 140, 106 S.Ct. 466, 88 L.Ed.2d 435 (1985); *Howard v.*

-30-

*Secretary of HHS,* 932 F.2d 505 (6th Cir. 1991); *United States v. Walters,* 638 F.2d 947 (6th Cir. 1981). Filing of objections which raise some issues but fail to raise others with specificity will not preserve all the objections a party might have to this Report and Recommendation. *Willis v. Secretary of HHS,* 931 F.2d 390, 401 (6th Cir. 1991); *Smith v. Detroit Fed'n of Teachers Local 231,* 829 F.2d 1370, 1373 (6th Cir. 1987). Pursuant to E.D. Mich. LR 72.1(d)(2), a copy of any objections is to be served upon this Magistrate Judge.

Within 14 days of service of any objecting party's timely filed objections, the opposing party may file a response. The response shall be not more than 20 pages in length unless by motion and order such page limit is extended by the court. The response shall address specifically, and in the same order raised, each issue contained within the objections.

s/ R. Steven Whalen
R. STEVEN WHALEN
UNITED STATES MAGISTRATE JUDGE

Dated: February 28, 2016

<u>CERTIFICATE OF SERVICE</u>

I hereby certify that a copy of the foregoing document was sent to parties of record on February 28, 2016, electronically and/or by U.S. mail.

s/Carolyn M. Ciesla
Case Manager to the
Honorable R. Steven Whalen

-31-